**INMATES OF the SUFFOLK COUNTY JAIL, et al., Plaintiffs**

v.

**Robert C. RUFO, et al., Defendants.**

**Civ. A. No. 71–162–REK.**

United States District Court, D. Massachusetts.

Jan. 25, 1994.

**32**

Max D. Stern, Lynn G. Weissberg, Stern & Shapiro, Boston, MA, for plaintiffs.

Thomas O. Bean, Attorney General's Office, Douglas Wilkins, Office of the Atty. Gen., Criminal Bureau, Chester A. Janiak, Burns & Levinson, Boston, MA, for defendants.

**Memorandum and Order**

KEETON, District Judge.

This case is before the court on the revised motion of the defendant Robert C. Rufo (the "Sheriff") to modify the Consent Decree of May 7, 1979 (as modified by the orders of April 11, 1985 and April 22, 1985) to permit double-bunking of inmates at the Suffolk County jail at Nashua Street (Docket No. 278, filed August 9, 1993). Also before the

court are plaintiffs' opposition (Docket No. 292, filed November 23, 1993) and appendix (Docket No. 289, filed November 15, 1993); the Sheriff's Reply (Docket No. 293, filed December 1, 1993); plaintiffs' supplemental memorandum in opposition to Sheriff's proposal (filed in open court, December 2, 1993); the response of the defendant Commissioner of the Massachusetts Department of Correction (the "Commissioner") (Docket No. 285, filed October 15, 1993); the Commissioner's reply regarding the § 52A issue (Docket No. 294, filed December 8, 1993); the Sheriff's supplemental memorandum regarding population of pretrial detainees (Docket No. 295, filed December 14, 1993); Affidavit of Robert C. Rufo (Docket No. 296, filed December 14, 1993); and plaintiffs' supplemental memorandum regarding population and transfer data (Docket No. 297, filed December 15, 1993).

**I.**

The court's Memorandum and Order of March 31, 1993, sets out the long history of this case. The essential facts are that in 1979, after eight years of litigation, the parties to this action entered into a consent decree to provide a "suitable and constitutional jail for Suffolk County pretrial detainees." *Inmates of Suffolk County Jail v. Kearney,* Civ. Action No. 71–162–G (D.Mass. May 7, 1979). The original plan provided, among other things, for 309 single-occupancy cells; it was modified in 1985 to provide for 453 single cells.

In proceedings that eventually reached the Supreme Court, the defendants sought, in 1989, to modify the consent decree to allow for double-bunking rather than single cells. *See Rufo v. Inmates of Suffolk County Jail,* —— U.S. ——, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992). The Supreme Court ruled that modification of a consent decree may be appropriate when the moving party establishes as a threshold matter "that a significant change in circumstances warrants revision of the decree." *Rufo,* —— U.S. at ——, 112 S.Ct. at 760. If this threshold is crossed, the court "should consider whether the proposed modification is suitably tailored to the changed circumstance." *Id.*

By Memorandum and Order of March 31, 1993, this court found that a significant change in circumstance had, in fact, occurred:

> I find that increases [in the inmate population] in some dimension were foreseeable as at least quite likely, if not more probable than not, both when the decree was fashioned and when it was later modified. But I also find that the current numbers of pretrial detainees are higher than actually anticipated or reasonably foreseeable, either when the consent decree was entered, or when the previous modifications of the consent decree were sought and approved.

Memorandum and Order of March 31, 1993 ("Mem. & Ord."), pp. 16–17.

The changed circumstance that has been proved in the present proceedings is an increase in the population of pretrial detainees beyond that actually foreseen at the time of the consent decree in 1979 and beyond that actually foreseen at the time of the modification in April, 1985.

After finding on March 31, 1993, that a change in circumstance had occurred, the court nevertheless denied the Sheriff's motion to modify the consent decree because the Sheriff had failed to show that his proposed modification was tailored to fit the changed circumstance. Mem. & Ord. p. 26. Specifically, the court found that 1) the Sheriff had proffered to the court no reasoned exploration of other feasible alternatives that would maintain the integrity of the consent decree; 2) the Sheriff had not proffered any basis for comparing the costs and benefits of physical modifications to the Nashua street facility with the costs and benefits of developing other facilities; and 3) the Sheriff had not made any showing of participation in the decision-making process by other responsible officials. The court's denial of the motion to modify was without prejudice, however, to any future proposals by the Sheriff that adequately fit the changed circumstances.

## II.

### A.

■ The Sheriff's more recent submissions, now under consideration, again fail to demonstrate that the proposed modification of the consent decree is adequately tailored to fit the changed circumstance previously found by the court, as well as other changed circumstances that it now appears have occurred or may be expected to occur in the near future—for example, in the next five years. "Tailored," as I understand the Supreme Court's use of the term, —— U.S. at ——, 112 S.Ct. at 760, does not mean simply that the proposed modification fulfills the Sheriff's objectives; "tailored" implies that the consent decree, even though altered, is not completely refashioned—at least not unless the changed circumstances so require.

In the Sheriff's favor, I find that he is confronted by an enormous problem not of his own making. But the fact remains that his predecessor, together with other defendants, entered into a consent decree, an important part of which was the provision of a separate cell for each pretrial detainee. Moreover, associated with this single-occupancy feature, as will be more fully explained below, were other features regarding the amount of space per inmate in the entire facility for support services.

■ The Sheriff, in his revised plan, states that changed circumstances require double-bunking of male pretrial detainees in 161 of the 419 cells currently available for males (34 of the 453 cells are in a unit for housing female detainees). This would increase the capacity of the part of the jail used for males about 40%, from 419 to 580 beds, allowing the Sheriff to keep custody of an additional 161 male pretrial detainees each night. Stated another way, the Sheriff's proposal would place up to 322 male inmates in double cells. This would convert the Nashua Street facility from one totally committed to single cells into one in which over 55% of the male inmates would be double-bunked. Thus, what had been wholly a single-bunking facility, with appropriate additional spaces for meals, medical attention, recreation and other needs, would become primarily a double-bunking facility. Also, the male population would be increased by 40%, with no increase in any facility other than bunking. The Sheriff has failed to demonstrate that this proposed increase in capacity by double-

bunking in 161 cells is tailored to fit the changed circumstance.

## B.

The modification order of April 11, 1985 permitted the capacity of the new jail to be increased in any amount as long as four conditions were met. The first two of these were as follows:

(a) single-cell occupancy is maintained under the design for the facility;

(b) under the standards and specifications of the Architectural Program, as modified, the relative proportion of cell space to support services will remain the same as it was in the Architectural Program;

Order of April 11, 1985.

Since only one inmate would be in each cell under the first condition, and the proportion of cell space to space for support services would be maintained under the second condition, these two conditions together mandated that the space for support services per inmate not be reduced.

In addition to double-bunking more than 55% of the inmates, the plan now proposed by the Sheriff reduces the space for support services per inmate to less than 45% of the space provided by the consent decree as modified. This reduction of space for support services has a severe impact on conditions of confinement in another way: it causes each inmate who is double-bunked to suffer the loss of privacy and the increased risks of violence and disease incident to double-bunking for an increased number of hours per 24–hour period, because congestion that would otherwise exist in the spaces for support services means a smaller percentage of all inmates may be allowed in those spaces at any given time.

In view of these considerations, one flaw in the Sheriff's revised plan is that it does not give adequate consideration to other aspects of the consent decree than single occupancy of cells. The essence of the consent decree is not captured by a focus simply on single-occupancy of each cell. And the impact of the proposed change would be not simply on the inmates who were double-bunked. It would extend instead to every inmate because of the dramatic reduction of space per inmate for support services and time per inmate out of cell.

In deciding the matter now before me, I must, of course, be guided by the determination of the Supreme Court that "on remand the District Court should consider whether the upsurge in the Suffolk County inmate population *was foreseen* by the petitioner," rather than foreseeable, *Inmates v. Rufo*, —— U.S. ——, ——, 112 S.Ct. 748, 761 (1992) (emphasis added). Also, I must be guided by the Supreme Court determination that this court was

in error in holding [in 1990] that even under a more flexible standard than its version of *Swift* required, modification of the single cell requirement was necessarily forbidden.

*Id.*, —— U.S. at ——, 112 S.Ct. at 762. I understand this mandate to mean, however, not that the change from single to double-bunking is to be treated as irrelevant but that it is to be considered only as a factor among others to be weighed in determining whether a "proposed modification is suitably tailored to the changed circumstance" that I have found. This factor has some weight against finding that the modification now proposed by the Sheriff is tailored to the changed circumstance. The inconsistency of the proposed change with the provisions of the consent decree and the April 1985 modification with respect to maintaining the prescribed amount of space (outside of the cells) for inmate support services is an added factor of significant weight.

A second flaw in the Sheriff's revised plan is that, again, as was true of the proposal submitted in 1992–93, the Sheriff has failed to proffer an adequate basis for comparing the costs and benefits of physical modifications to the Nashua street facility with the costs and benefits of developing other facilities. The Sheriff has set out in some detail the economic costs of modification as opposed to new construction, but the Sheriff has ignored other, highly relevant "costs" of his plan. What, for example, would be the cost to the inmates of the proposed 40% increase in inmate population, in terms of reduced

time out of cell and reduced access to (and greater congestion of) medical care, laundry facilities, dayroom space, exercise areas, the law library, and permissible uses of other common spaces? Access to adequate common spaces formed an important objective of the consent decree; limitations on this access should have been considered by the Sheriff in any cost/benefit analysis. Similarly, other costs to the inmates (*e.g.*, increased threat from disease or violence) should have been included in the equation.

A third factor that affects the adequacy of the Sheriff's plan is the failure to make an appropriate showing of participation in the decision-making process by other responsible officials. I credit the Sheriff himself with making reasonable efforts to comply with the consent decree and to alleviate overcrowding at the Nashua Street facility, both through efforts to get cooperation in streamlining bail proceedings and in arrangements for transfer of male inmate commitments in excess of 419. Proof is entirely lacking, however, that other officials have taken their respective obligations as seriously as the law requires, and have made reasonable efforts to comply with them. Among the other officials are all of the defendants in the original action, who were jointly and severally liable for complying with the consent decree. Rather than applying their joint efforts toward developing new facilities or other alternatives to ease the overcrowding, the present record suggests that other responsible officials have primarily focused on urging the Sheriff to press before this court his proposal for obtaining double-bunking at Nashua Street.

Indeed, achievement of the Commissioner's apparent goal—vacating the consent decree—would almost certainly result in pressure on the Sheriff to double-bunk *all* cells in the facility, which would create a high risk—virtually a near certainty, absent an unexpected downturn in the number of pretrial detainees—of unconstitutional overcrowding. This willingness to leave the Sheriff to function as best he can within the constraints of the consent decree, without seriously examining the Commissioner's obligations, the County's obligations under Mass.Gen.Laws ch. 34 § 3 to provide a suitable jail, and the obligations of all responsible officials to provide adequate funding for needed facilities to meet the increase in inmate population, evinces a disregard for constitutional requirements and for the terms of the consent decree as well as a failure to cooperate to the extent that their joint and several liability requires.

Finally, a fourth factor weighing against a determination that the Sheriff's revised plan is appropriately tailored to the changed circumstances is that in this plan, filed in August, 1993, the Sheriff suggested increasing capacity at the jail by a total of 161 beds even though, by his own count, there were only 82 male inmates in excess of available cells on an average night. Memorandum, Docket 278, p. 5 and attached statistical exhibit 3. The Sheriff did not attempt to explain why double-bunking twice as many inmates as was then necessary, and without consideration of alternative means of meeting occasional or seasonal changes in inmate population, would be justified under the consent decree.

I recognize that the Sheriff has since filed new inmate counts showing that each month since August, the average number of male pretrial detainees in excess of cell capacity has increased still more. Reply, Docket 293 and attached exhibits. For the period August, 1993 through November, 1993, the Sheriff now says that the average number of detainees in excess of cell capacity is 181, a 120% increase over the number originally reported in the revised plan. The Sheriff, however, has filed no further submission regarding what he and other responsible officials have done, or are doing, to provide even constitutionally minimum conditions of confinement for the numbers of inmates shown by these most recent counts.

Far from supporting the Sheriff's present proposal for an increase in double-bunking, the extreme rate of increase reported in this most recent submission, unless aberrational, would be persuasive support for the position that alternative arrangements, beyond double-bunking, will clearly be necessary. If the Sheriff's figures are not aberrational so far but level off, then even if the Sheriff's current double-bunking proposal were allowed,

there would still be an average of twenty more detainees than cell spaces each night. If, on the other hand, the current rate of increase were to continue, by March 1994 the Sheriff would have over 400 inmates in excess of cell capacity and would soon need to consider *triple*-bunking in order to keep all inmates at Nashua Street. The dramatically different consequences flowing from these two different assumptions make it apparent that a proposal cannot be evaluated without additional evidence that would support a reasoned choice between, or somewhere in the range defined by, these conflicting assumptions.

A key point is that the Sheriff has not begun to show that the data submitted support the inference that the Sheriff asks the court to draw. If data are to be used as a basis for decision-making, both the data gathering and the inferences to be drawn should be shown to be supportable by creditable standards of statistical method. Also, if proof were offered to make the case that the inmate population will continue to increase at such a substantial rate, then some other, permanent alternatives to the Nashua Street facility would have to be pursued to meet constitutional requirements. Deeper questions then would arise as to whether it would make any sense to alter the current facility as dramatically as the Sheriff proposes, without any showing that other means of meeting the needs that will exist two or three or five years from now are being considered.

Could the court find, on this kind of record, that the percentage increase in jail capacity now proposed by the Sheriff is tailored to meet changed circumstances now foreseen, while continuing to honor to any degree the essence and the expressed objectives of the consent decree? Addressing this question is not an endeavor that can be expected to produce a categorical answer—or an answer that, by scientific methods, can be shown to be demonstrably correct. But, as Justice Holmes once noted, "the law is full of instances [requiring estimates of] ... some matter of degree." *Nash v. United States,* 229 U.S. 373, 377, 33 S.Ct. 780, 781, 57 L.Ed. 1232 (1913); *see also United States v. Powell,* 423 U.S. 87, 93, 96 S.Ct. 316, 320, 46 L.Ed.2d 228 (1975) (quoting this language).

### C.

■ The Sheriff's first proposed modification overreached by far; his second missed the fit by a smaller margin. Rather than send the Sheriff back for a third attempt at fashioning an appropriately tailored modification, the court, relying on the arguments and submissions of the parties and on the factors explained above and below, has provisionally determined that it is appropriate to order the following modification of the consent decree:

> The Consent Decree of May 7, 1979 (as modified by the orders of April 11, 1985 and April 22, 1985) is further modified to the extent that, and only to the extent that, as long as no inmates other than Suffolk County pretrial detainees are assigned to the Nashua Street facility, the Sheriff
>
> (1) may alter up to 100 cells to permit double occupancy, and
>
> (2) may, at any given time, place two inmates in each of the altered cells to the extent necessary to have space within the Nashua Street facility for all Suffolk County pretrial detainees committed to the Sheriff's care.

### D.

***Double–Bunking A Maximum of 100 Cells Will Take into Account the Changed Circumstance Without Reducing the Consent Decree to or Below the Constitutional Floor***

On the present record I find that, more probably than not, the reported dramatic increase in numbers of pretrial detainees committed by the Sheriff since August 1993 is temporary rather than the beginning of an ongoing trend of a totally different dimension. I find, also, that if this is not the case, the Sheriff's proposal still would not fit the new circumstance.

In any event, because of the absence of any adequate basis for finding that the count since August reflects a long-term trend, I find that more probably than not the changed circumstance in this case, the *unforeseen* increase in the number of pretrial

detainees, can be adequately addressed by double-bunking inmates in up to 100 cells, and by continuing to transfer detainees under Mass.Gen.Laws ch. 276 § 52A. In 1993, the average number of § 52A transfers was 85. Memorandum, Docket No. 297 p. 3. An equal rate of transfer in the future, combined with the addition of 100 new beds, can accommodate an average of 145 inmates committed to the Sheriff's custody in excess of capacity. Even the peak number in 1993 of 181 inmates in excess of capacity could be accommodated with the 100 additional beds and continuing transfers.

I also find that it cannot sensibly be declared that the integrity of the consent decree would be undermined by converting a limited number of cells on a conditional basis to double occupancy, and by using these cells for double occupancy only when the numbers committed to the Sheriff's custody so require. Of course, any particular number chosen as the place to draw the line is subject to criticism as being arbitrary in comparison with more or fewer cells. This truth, however, is not a valid ground for drawing no distinction anywhere along the spectrum from double-bunking no cells to double-bunking ultimately all the cells, the latter of which plainly would fundamentally alter the nature of the Nashua Street facility. Taking account of all the circumstances and factors presented by the record before me, I find that allowing double-bunking in 100 cells, with the further conditions stated in the proposed order, is the most appropriate place to draw the line.

Even with 100 double-bunked cells, the Nashua Street facility will continue to be, from the perspective of inmates, primarily a single-cell institution, with at least 60% of all inmates in single cells. The 24% increase in male population, from 419 up to a maximum of 519, would impair to some extent the access of each inmate to and use of common areas, but I find that it would not undermine the overall objectives of the consent decree.

Finally, although modifying a consent decree based on changed circumstances might discourage settlement of institutional cases, the court must also consider that "[p]arties will be reluctant to sign a consent decree if they will be locked into its terms however the future may unfold." *Duran v. Elrod,* 760 F.2d 756, 762 (7th Cir.1985). A modification that leaves the primary objectives of the consent decree intact while taking into account the changed circumstances provides a workable compromise between these competing concerns.

### E.

### *The Modification Gives Deference to State Decision–Making*

The Supreme Court has instructed that, once the threshold requirements for modification of a consent decree have been reached, the court should give deference to the views of local officials who will have to implement the decree as modified. *Rufo v. Inmates of Suffolk County Jail,* — U.S. ——, ——, 112 S.Ct. 748, 764, 116 L.Ed.2d 867 (1992). A federal court in any event should be loathe to become entangled in the intricacies of administrative and institutional decisions. For this reason, the court has proposed a general modification that refers only to the number of cells to be converted, and defers to the judgment of local officials on the specifics of what a proper conversion should include. The court notes, however, that the Sheriff has proposed in great detail the changes he would make if double-bunking were allowed, including enlarging the window on cell doors to enhance safety, increasing staffing at the facility, and implementing a classification system to determine which inmates may appropriately be double-bunked. Reply, Docket No. 293, ex. A. Such changes may indeed be required in order to meet constitutional minimums for double-bunking.

### III.

Before explaining additional considerations I have taken into account in determining that this further modification of the consent decree is appropriate, I turn to other questions that I have provisionally determined should be decided forthwith:

First, is this case to remain open, or should it be closed with the entry of the order modifying the consent decree?

Second, what order, if any, should the court make regarding the certification of the plaintiff class?

## A.

▮ At the scheduled conference held on May 10, 1993, the court suggested that, after resolution of the motions to modify the consent decree, it may be appropriate to enter a final order closing this case. Such an order would bring finality to a proceeding that has been pending for more than 22 years and that continues to be both time-consuming and resource-consuming.

The most recent submissions regarding nightly count of inmates committed to the Sheriff present a consideration that weighs against closing the case immediately. As noted earlier in this memorandum, the Sheriff's last submission regarding inmate counts indicates instability of circumstances affecting the count and uncertainty about whether the counts of recent months will turn out to be an aberration from a trend of more than a decade, or instead the beginning of a new and significantly different trend. Given this immediate circumstance, I have provisionally concluded that it is appropriate to set a date for closing this case far enough into the future to allow either plaintiffs or defendants to seek, on specified conditions less onerous than those applying to a closed case, relief from the order to be entered at this time.

I will invite additional submissions from the parties, stating their respective positions with respect to this provisional determination for closing the case at some specified time— for example, five years from the entry of the combined order modifying the consent decree and closing the case.

One factor supporting such a delayed closing of the case rather than immediate closing is the need for a period of time to accomplish the alterations of the Nashua Street facility that the Sheriff may choose to make consistently with the terms of the modification of the consent decree described above. As already noted, the installation and use of a second bunk in up to 100 cells will significantly affect not only the inmates (up to 200) assigned to those bunks but also the access of all other inmates to support services inci-dent to the fact that support-services space in the facility per inmate will be dramatically reduced.

In order to comply with the consent decree under the changed circumstances, the combined efforts of all responsible officials will be required, including the Massachusetts Commissioner of Correction, the Sheriff of Suffolk County, the Master of the jail, and Suffolk County Commissioners (including the mayor). See Inmates of the Suffolk County Jail v. Eisenstadt, 360 F.Supp. 676 (D.Mass. 1973) (naming defendants).

Moreover, it appears likely that some time will be required for the responsible officials jointly to develop a permanent solution for increases in the inmate population, if the increases do in fact reach levels as high as the Sheriff asks this court to predict.

It is my provisional finding that it is appropriate to allow a five-year period before closing the case, during which the parties would have ready access to the court should disputes arise regarding consistency of the developed solution with the modified consent decree.

In addition, some period of experience under the modified decree before closing this case is appropriate because the change in circumstance that has necessitated a modification of the decree is not static; that is, we can expect still more changes in inmate population to occur. Factors having a potential bearing on the likelihood and degree of change are to some extent re-enforcing—that is, some factors point with multiplying force in the same direction, whether toward increase or toward decrease of inmate population. But it is also true that some factors conflict, pointing in opposite directions. The many factors that may have influence include, for example, possible demographic changes. Some changes can be expected from migration into and out of Massachusetts and from the overall aging of the national population and of the population of Suffolk County. Demographic characteristics of regional and local populations are likely to differ from those of the national population in ways that affect the number of pretrial detainees in Suffolk County. It is possible,

also, that the number of pretrial detainees will continue to increase at such a rate as to compel a complete reevaluation of all current custody procedures. As another example, it is also possible that within five years, medical developments will have dramatically altered the perceived threat of TB or other communicable diseases, significantly increasing or decreasing one of the dangers that single cells help to control in current circumstances.

### B.

During oral argument on December 2, 1993, and in a Memorandum filed with the court (Docket No. 285), the Commissioner suggested that the court should close the certified class of plaintiffs after a final order is entered in this case. No Motion to this effect was filed, however, and the plaintiffs have not responded to this suggestion.

The Commissioner's proposal to close the certified class may be seen from another perspective as raising problems similar to those raised by the Commissioner's previous motion to vacate the consent decree. In their submissions to be filed, counsel are requested to advise this court of their positions on the Commissioner's proposal and how they may be affected by the guidance provided by the First Circuit in *Inmates v. Rufo,* 12 F.3d 286 (1st Cir.1993).

In light of the court's provisional determination that the consent decree, as modified, should be left in place but that this case should be closed (see Part V below), I conclude also, provisionally, that it is not necessary to decide what if any modification of the class in this case might otherwise be appropriate.

As now contemplated, the final order to be entered would declare that, from a date five years after entry of the order, no further supervision by this court would occur and no further motion for modification of the consent decree would be entertained by the court, unless an appropriate motion to reopen the case had first been allowed. Within the next five years, however, the parties would have access to the court on motion showing cause, without the necessity of meeting the criteria applicable to relief from a final judgment. If, during the five years,

experience in gathering and evaluating data on the effect, necessity and utility of double-bunking revealed good reason for further modification of the consent decree, plaintiffs and defendants alike would be free, under the proposed order, to file an appropriate motion.

### INTERLOCUTORY ORDER

For the foregoing reasons, it is hereby ORDERED:

(1) Defendant Rufo's revised motion to modify the Consent Decree (Docket No. 278) is allowed in part and denied in part, as explained in the foregoing memorandum.

(2) Any party wishing to file a submission with the court regarding the proposed modification of the consent decree or the court's determination that this case should be closed may do so on or before February 25, 1994.

(3) If no submission is received by the court within the allowed time, then effective February 26, 1994, the following modification is ordered:

The Consent Decree of May 7, 1979 (as modified by the orders of April 11, 1985 and April 22, 1985) is further modified to the extent that, and only to the extent that, as long as no inmates other than Suffolk County pretrial detainees are assigned to the Nashua Street facility, the Sheriff

(1) may alter up to 100 cells to permit double occupancy, and

(2) may, at any given time, place two inmates in each of the altered cells to the extent necessary to have space within the Nashua Street facility for all Suffolk County pretrial detainees committed to the Sheriff's care.