Robert E. CAMERON, Plaintiff,
Appellee,

v.

Henry TOMES, et al., Defendants,
Appellants.

No. 92–1343.

United States Court of Appeals,
First Circuit.

Heard Oct. 8, 1992.

Decided March 31, 1993.

Elisabeth J. Medvedow, Asst. Atty. Gen., Com. of MA, with whom Scott Harshbarger, Atty. Gen., Com. of MA, was on brief, for defendants, appellants.

David M. Rocchio with whom Robert D. Keefe, Mark G. Matuschak, and Hale and Dorr were on brief, for plaintiff, appellee.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and BOUDIN, Circuit Judge.

BOUDIN, Circuit Judge.

This case was brought by Robert Cameron, who is currently detained in the Massachusetts Treatment Center for the Sexually Dangerous ("the Treatment Center"). The defendants, whom we refer to as "the state," are officials who are responsible for the Treatment Center. In substance, Cameron complains that his conditions of confinement violate the Due Process Clause of the Fourteenth Amendment and his asserted constitutional "right to treatment."

After a bench trial the district court granted injunctive relief and the state appealed. We modify the injunction in accordance with this opinion and, with certain clarifications, otherwise affirm most of the relief ordered by the district court. Our decision is based upon the district court's findings but rests upon somewhat different legal grounds.

## I. THE FACTS AND PRIOR PROCEEDINGS

On December 13, 1978, Cameron was convicted in Vermont of aggravated assault with a deadly weapon and sexual assault—apparently attempted rape—and sentenced to a term of six to twenty years. He was then extradited to Massachusetts and convicted on September 12, 1979, for assault with intent to rape, kidnapping, and other crimes, and sentenced to a term of ten to twenty years, commencing after the Vermont sentence. On being paroled by Vermont on July 12, 1982, Cameron began serving his Massachusetts sentence, which

at the time of trial was set to expire in the year 2002.[1]

After serving several years in a Massachusetts prison, Cameron on November 14, 1985, was adjudged by the Massachusetts Superior Court to be a sexually dangerous person under M.G.L.A. c. 123A, and committed to the Treatment Center for a period of one day to life. The occasion for the commitment is not described. The Treatment Center, one of several facilities located at MCI Bridgewater, has a checkered history, much of it embroiled in litigation, e.g., Langton v. Johnston, 928 F.2d 1206 (1st Cir.1991), and M.G.L.A. c. 123A itself has an uncertain future.[2] Most of the Treatment Center's inhabitants have underlying criminal convictions, and it is administered jointly by the Departments of Mental Health and Corrections to address both the medical and security aims of the Center. Cameron's stay at the Treatment Center appears to have been even more unhappy than normal.

Although the parties agree on little else, it appears that Cameron who is 50 years old and a Vietnam veteran suffers from severe psychological disorders. In the words of the district court, "Cameron suffers from a borderline or mixed personality disorder and post-traumatic stress disorder. There is also no dispute that as a result ... he may often act in a paranoid and confrontational manner." Cameron v. Tomes, 783 F.Supp. 1511, 1517 (D.Mass.1992). Psychological treatment is available at the Treatment Center—indeed, its availability is provided for under a consent judgment entered many years ago[3]—but Cameron found what was offered unsuitable until 1989 when he established a working relationship with a therapist.

In the meantime, Cameron brought the present suit in 1986 challenging his conditions of confinement. Counsel was assigned, his claims evolved, and in December 1991 and January 1992, the district court conducted a six-day bench trial in the case. In his opinion issued on February 14, 1992, the district judge declared that Cameron had a "constitutional right to minimally adequate treatment [for his mental disorders] based upon the exercise of professional judgment." 783 F.Supp. at 1516. The court rejected a motion to dismiss by the state, which had argued that no such constitutional right existed. Id. It also rejected the state's res judicata defense, id. at 1516–17, based on the Langton case where a different district judge had found that the Treatment Center was in general compliance with the consent decree. See Langton, 928 F.2d at 1208–16.

The district court then ruled that, on a number of issues, those in charge of the Treatment Center had made judgments about Cameron and enforced policies against him without, or contrary to, the advice of the medical professionals involved in his treatment. 783 F.Supp. at 1518–25. The district court made specific findings relating to Cameron's access to outside medical care, the use of shackles and an armed guard in transporting him, his housing in the facility, physical searches of him, and similar matters. The court then granted injunctive relief on ten different matters. Id. at 1526–27.

First, and most broadly, the court ordered the pertinent administrative board within the Treatment Center to conduct an immediate review of his current sexual dangerousness, appropriate treatment and conditions, and his request to participate in

1. The district court opinion recites that the Massachusetts sentence ended in February 1992; but the parties advise us that Cameron's release date at the time of trial was 2002. Cameron's brief says that this period may be shortened by good time credits and possible parole.

2. The statute is one of the so-called sexual psychopath laws enacted in the 1940s in a number of states. See C. Tenney, Sex, Sanity and Stupidity in Massachusetts, 42 B.U.L.Rev. 1 (1962). In 1990, the Massachusetts legislature curtailed

new admissions into the Treatment Center. See Langton, 928 F.2d at 1209.

3. Regulations adopted pursuant to the decree provide that "[e]very patient shall be offered treatment to effect his early return to public society. Such treatment shall consist of medical, psychiatric [and other services] ... Such treatment shall be administered ... in the least restrictive conditions which are consistent with [the patient's] security needs." Langton, 928 F.2d at 1211.

what is called the community access program. 783 F.Supp. at 1526. This injunctive provision ended by stating: "All final decisions on Cameron's long-term treatment, including his participation in the community access program, must be made by a qualified professional, or with due respect and regard for the judgment of a qualified professional." *Id.*

Several other decree provisions are similarly qualified. The court suspended the use of shackles and an armed guard in transporting Cameron for outside medical care unless and until "a qualified decision maker determines through the exercise of professional judgment that such restraints are professionally acceptable, based on a weighing of [the state's] needs along with Cameron's treatment needs." 783 F.Supp. at 1526. Prohibited, under a similar condition, were subjecting Cameron to a restrictive internal movement policy, to an intrusive search procedure previously used and so-called "oral cavity searches," and to the "current disciplinary system" of the Treatment Center. *Id.* at 1526–27.

Finally, without any qualification as to professional judgment, the court ordered that Cameron be allowed medical treatment at Veterans Administration facilities for specific medical conditions, that he be allowed housing in the maximum privilege unit of the Treatment Center without consenting to share a room, and that a handicapped accessible room be immediately made available to him. 783 F.Supp. at 1526. This last direction, as well as several of the others, was related to physical disabilities suffered by Cameron, including the amputation of a leg due to infection while Cameron was in the care of the state.

## II. DISCUSSION

*Res Judicata.* The state's threshold objection to the suit is that Cameron's claims are encompassed by prior litigation and are therefore barred as *res judicata.* Emphasizing the "claim preclusion" branch of *res judicata,* the state's brief says that one of

the consolidated district court cases embraced by *Langton*—*Bruder v. Johnston*—was a class action suit concerning the right to treatment for all persons confined at the Treatment Center as of 1987. Cameron, says the state, was a member of the class and the state prevailed in that case on the ground that treatment was adequately provided.

■ We agree with the district court that the state has made no showing that Cameron's claim is barred by *res judicata.* Cases on *res judicata,* ample in many areas, are fairly sparse where preclusion of distinctive individual claims is urged based upon an earlier class action judgment. But in *Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 880, 104 S.Ct. 2794, 2801–02, 81 L.Ed.2d 718 (1984), the Supreme Court confirmed what common sense would suggest: a class action judgment—there, in a discrimination case—binds the class members as to matters actually litigated but does not resolve any claim based on individual circumstances that was not addressed in the class action. *Id.* at 880–82, 104 S.Ct. at 2801–02.

Under *Cooper,* we think that *res judicata* plainly does not apply in this instance. The several law suits and years of proceedings embraced by *Langton* require pages to describe, but the suits were concerned with fairly general issues (*e.g.,* physical plant, sequestration, equality of treatment) and with specific claims of individuals other than Cameron.[4] The closest that that litigation came to this case was (1) endorsement of a general requirement of treatment set forth in state regulations, (2) rejection of a charge that the authorized absence program was underutilized, and (3) rejection of a general attack on the "double bunking" requirement. These claims dealt with the general condition of inhabitants of the Treatment Center. If *Langton* has anything else in common with this case, the state has not mentioned it.

---

**4.** A detailed history of the litigation and the issues decided is contained in the thorough, 171-page, unpublished decision of Judge Maz-
zone, which this court in *Langton* affirmed on all issues apart from attorney's fees.

This case, by contrast, rests primarily on Cameron's claims that his unusual situation requires special accommodations: specifically, that his physical disability affects his need for outside medical visits, freer movement within the Treatment Center, and separate bunking arrangements adapted to his handicap, and that his mental condition (what lay people would probably call paranoia) makes ordinary physical searches, disciplinary arrangements and other constraints unsuitable, indeed psychologically dangerous, for him. There is no suggestion by the state that these issues peculiar to Cameron were actually litigated in the *Langton* case.

■ Thus, the state's claim reduces itself to the argument that Cameron *had* to litigate those issues in the earlier cases or forever hold his peace. To describe this claim is to refute it: class action institutional litigation often addresses general circumstances, not the distinctive plight of someone claiming special needs or status. To the extent individual concerns were addressed in *Langton,* Cameron is not even mentioned in the district court decision. Nor could earlier cases deal with *later* occurring events that are a part of Cameron's present case. In theory, claim preclusion is possible where an earlier class action claim is essentially the same as a later action for individual relief, and issue preclusion is possible where a fact resolved in the class action proves important in the later action. *See Cooper,* 467 U.S. at 880–82, 104 S.Ct. at 2800–02. No such overlap has been shown here.

*The Merits.* The district court in this case premised its decision on what it deemed to be two established constitutional rights possessed by those at the Treatment Center: "a constitutional right to minimally adequate treatment [for mental disorders] based upon the exercise of professional judgment," 783 F.Supp. at 1516, and a right to be free from "[b]odily restraints" except "when and to the extent professional judgment deems this necessary...." *Id.* at 1520. It is not entirely clear whose professional judgment—medical or administrative—the district court had in mind; but

the implication of its discussion is that the administrators of the facility are bound to listen to the judgment of the medical professionals and to heed it unless they offer good reason for refusing to do so. *Id.* at 1519–20.

Both sides on this appeal seek a decision on the constitutional "right to treatment," the state urging that none exists and Cameron supporting the district court. In our view, a decision on the abstract issue of "a right to treatment" is not necessary for a disposition of this case; and the concept has only a remote connection to the actual relief sought. We address this point briefly, against the background of prior "right to treatment" law, before considering Cameron's own situation and the proper touchstone for appraising his claims.

It is settled that those who are confined by the state, for whatever reason, are entitled under the Constitution to food, clothing, medical care, and reasonable efforts to secure physical safety. Beyond such obvious essentials, however, guidance from the Supreme Court is largely confined to one cautiously phrased decision. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), a mother, unable to care for her retarded child, placed him in a state institution. Then, discovering that he was sometimes physically restrained by "soft" shackles and taught little in "basic self-care skills," she sued. The Supreme Court held that under those circumstances the child was constitutionally entitled to be free from any but necessary restraints and had a right to basic self-care training to secure safety and mobility. As for deciding when and how much, the Court said that judges should not dictate the choice among acceptable alternatives and that a "presumption" of correctness must be attached to "professional judgment." *Id.* at 321–23, 102 S.Ct. at 2461–62.

*Youngberg* left in limbo a prior line of lower court cases and academic literature that had sought to shape a broad constitutional "right to treatment," including treatment of the psychological ills of confined

persons.[5] Since *Youngberg,* a few circuits have ventured into this constitutional territory, returning with different answers.[6] We ourselves may have seemed to send mixed signals. In *Doe v. Gaughan,* 808 F.2d 871 (1st Cir.1986), this court, under the caption "constitutional right to treatment," agreed that *Youngberg* extended beyond the retarded to protect similar interests of those mentally ill persons civilly committed to a different Bridgewater facility. *Id.* at 884. In *Langton,* four years later, this court explicitly refused to decide whether there was a "constitutional right to treatment" at the Treatment Center, remarking that "the trial judge's skirting of the constitutional thicket was appropriate" as such issues should be decided only when necessary. 928 F.2d at 1217. One reason why it was unnecessary in *Langton* was that the consent decree "set a higher standard than the Constitution" in affording treatment for those in the Treatment Center. *Id.*[7]

Although the parties seek to litigate the abstract issue of a right to treatment, we prefer to plow a furrow no wider than the case demands. Cameron's claims for the most part are not really "right to treatment" claims at all: he is receiving substantial psychological treatment for his condition, and most of the arguments he is making concern housing, mobility, transportation, and security. Further, under existing state law, there is already a regula-

tion-based right to treatment at the Treatment Center that equals or exceeds anything that the Supreme Court would likely impose under the Due Process Clause. *See Langton,* 928 F.2d at 1217. It is also unclear whether, if the Supreme Court did provide a general "right to treatment" for civilly committed persons, it would apply that right to those held as well under criminal sentence. *Youngberg,* 457 U.S. at 321–22, 102 S.Ct. at 2461.[8] At the very least, the Court's approach in *Youngberg* suggests hewing to the case-by-case approach.

■ Taking that approach here, we think the touchstone for Cameron's claims is the Due Process Clause of the Fourteenth Amendment, requiring conditions that do not fall below the minimum standards of civilized decency. *See generally Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). Under this rubric, context works in Cameron's favor. While his prison sentence will expire in 2002 or even earlier, his confinement in the Treatment Center is from one day to life and will never end unless his condition improves and he is found to be no longer sexually dangerous. Thus, Cameron's best argument is that the state's ordinary procedures and constraints are affirmatively and needlessly *worsening* his mental condition, so that he may well be confined long after his sentence has expired. This is a claim with some bite, no matter how much lati-

---

**5.** *See* Stefan, *Leaving Civil Rights to the "Experts": From Deference to Abdication Under the Professional Judgment Standard,* 102 Yale L.J. 639, 686–90 (1992). Treatment, in any curative sense, was not even an issue in *Youngberg* since the retardation was not curable. The Court expressly declined to devise any general rights to ameliorative programs beyond basic self-help training to assure safety and mobility, saying "we need go no further in this case." 457 U.S. at 319, 102 S.Ct. at 2460.

**6.** *Compare, e.g., Ohlinger v. Watson,* 652 F.2d 775 (1980), *with Bailey v. Gardebring,* 940 F.2d 1150 (8th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1516, 117 L.Ed.2d 652 (1992). *See generally, Woe v. Cuomo,* 729 F.2d 96, 105 (2d Cir.1984) ("The Supreme Court has not directly addressed the question whether a constitutional right to treatment exists....").

**7.** In *Cortes–Quinones v. Jimenez–Nettleship,* 842 F.2d 556 (1st Cir.), *cert. denied,* 488 U.S. 823,

109 S.Ct. 68, 102 L.Ed.2d 45 (1988), and *Torraco v. Maloney,* 923 F.2d 231 (1st Cir.1991), this court addressed claims that authorities had not taken the precaution against suicide of individual prisoners. While both decisions spoke of the state's obligation to provide for medical needs, the context was very far removed from any generalized right to treatment for psychological conditions.

**8.** Whatever other significance it may have, we think that Cameron's criminal sentence does refute any claim that he is entitled under the Constitution to minimum physical restraint based on the judgment of his doctors. Quite unlike the child in *Youngberg,* Cameron is under criminal sentence of imprisonment for serious and violent crimes. To that extent, he lacks the same "liberty" interest as the child in *Youngberg.*

tude states ordinarily have to run their institutions.

Further, the findings of the district court, which control unless clearly erroneous, Fed.R.Civ.P. 52(a); *Doe v. Gaughan,* 808 F.2d at 877, lend support to Cameron's argument. The findings amount to a determination by the district court that procedures that might ordinarily be applied—such as certain of the searches and the internal movement controls—worsen Cameron's condition *and* may well be unnecessary in this case. *See* 783 F.Supp. at 1523–25.[9] On both points, effect and necessity, the district court says that this is the judgment of the medical professionals and that no adequate response has been obtained from the administrators. *Id.*

The state broadly disputes this version of events, pointing to other evidence showing how much it has helped Cameron and tried to accommodate his special needs. It does not, however, make much effort in its brief to rebut specific findings as to specific episodes. We think there is some conflict in the evidence but also that the district judge's findings are not clearly erroneous. It is true that these findings were made in the framework of a legal analysis that we do not adopt, but the findings fit well enough into a due process framework and this court may affirm on any grounds supported by evidence. *See Doe v. Anrig,* 728 F.2d 30, 32 (1st Cir.1984).

*Relief Ordered by the District Court.* The immediate relief ordered by the district court is, with one or two exceptions, fairly modest, primarily requiring further consideration of Cameron's case and some interim measures. Importantly, the court has ordered a general reappraisal of Cameron's treatment and conditions, with decisions to be made by the administrators "with due respect and regard for the judgment of a qualified professional." 783 F.Supp. at

1526. But given the district court's use in several contexts of the "professional judgment" standard, a word is in order for the guidance of the parties and for any future litigation that may ensue.

■ In an institution like the Treatment Center, as in an ordinary prison, security and administrative concerns may clash with the welfare and comfort of individuals, as the district court recognized. This was so in the facility at issue in *Youngberg,* 457 U.S. at 320, 102 S.Ct. at 2460, and it is surely so in the Treatment Center where most if not all those detained have been convicted of crimes and many may be dangerous. Any professional judgment that *decides* an issue involving conditions of confinement must embrace security and administration, and not merely medical judgments.

■ Thus when it comes to appraising the judgments of the administrators, it does not follow that they are bound to do what the doctors say is best for Cameron even if the doctors are unanimous. The administrators are responsible to the state and to the public for making professional judgments of their own, encompassing institutional concerns as well as individual welfare. Nothing in the Constitution mechanically gives controlling weight to one set of professional judgments. Indeed, when it comes to constitutional rights, none of the professionals has the last word. Professional judgment, as the Supreme Court has explained, creates only a "presumption" of correctness; welcome or not, the final responsibility belongs to the courts. *See Youngberg,* 457 U.S. at 323, 102 S.Ct. at 2462.

■ With this clarification as to the role of "professional judgment," we sustain the first injunctive relief provision ordered by the district court directing the general re-

---

**9.** For example, the court invoked the testimony of Cameron's therapist that the shackling was "harmful to Cameron's mental health" and the court found it unnecessary based on "uncontroverted evidence." 783 F.Supp. at 1520. The court determined that the Treatment Center's internal movement policy, allowing free movement for only 10 minutes each hour, was un-

workable for Cameron as an amputee, creating "undue pressure [that] ... compromises his treatment." *Id.* at 1522. A forcible search of Cameron while handcuffed, which the court found may well have been unnecessary, drove Cameron into moods of "helplessness, anger, despair and hopelessness...." *Id.* at 1523.

appraisal of Cameron's personal dangerousness and of his general conditions of confinement. Para. 1 (783 F.Supp. at 1526). The findings noted above and the evidence portrayed in the district court's decision support this fairly modest directive. In framing equitable relief, a district court has substantial latitude, and we think its "remand" to the Treatment Center administration is well within its authority.

▮ We also conclude that, on the same basis and with the same clarification as to the role of professional judgment, the district court's findings, see 783 F.Supp. at 1522–24, support several other conditioned decree provisions: that administrators consider requests by Cameron for treatment outside the Treatment Center, para. 4 (id. at 1526); that the ten-minute movement restriction and oral-cavity searches be suspended as to Cameron unless and until a qualified decision-maker concludes that they are appropriate for Cameron; and that the "Extraction Team" searches of Cameron be barred unless there is prior consultation with a Treatment Center clinician. Paras. 5, 6 and 8 (id. at 1526).

▮ On two other decree provisions, we believe modifications are required. First, the district court ordered that an armed guard and shackles no longer be used when transporting Cameron outside the facility unless and until a qualified decision-maker determines this to be necessary. Para. 3 (783 F.Supp. at 1526). In matters of security, as opposed to administrative convenience, the administrators' discretion is at its zenith and Cameron is still under criminal sentence.[10] An armed guard and shackles may seem needless precautions for an amputee, but we think that the Treatment Center should not be obliged to suspend its specific security measures for outside visits while Cameron's case is being reexamined. If the district court wishes to require this armed-guard-and-shackles re-

quirement to be re-examined on an expedited basis, that is within its province.

Second, we similarly modify the district court's general injunction preventing the Treatment Center "from enforcing the current disciplinary system, run by Department of Correction personnel, against Cameron" until a new system suitable to his needs is constructed. Para. 7 (783 F.Supp. at 1526). We have no problem with the decree's requirements that the administrators consider whether changes are warranted in the current system as applied to Cameron and that medical judgments be weighed in this process. But we think that a generally phrased suspension of "the current disciplinary system" in the meantime cuts too broadly and may raise security issues as well.

Finally, we sustain three unqualified decree provisions made by the district court: that Cameron be allowed to continue, as apparently he is at present, visits to Veterans Administration facilities related to his amputation, circulatory problems, and possible cancer; that the "consent" to double bunking be waived as to Cameron, the "consent" being largely symbolic; and that a handicapped accessible room, including a hospital bed if necessary, be made available to him. Paras. 2, 9, 10 (783 F.Supp. at 1526–27). These specifics of relief lie largely within the judgment of the district court, and the state's brief makes no targeted showing that these provisions are improper.

## III. CONCLUSION

No one who reviews this record can dispute that Cameron has done harm in the past, nor doubt that he has been afflicted with serious mental illness. The findings of the district court suggest that, without special attention to his peculiar circumstances, further damage will be done to his mental condition. We conclude that the state does have a Due Process Clause obligation, to be balanced by it with competing

---

10. M.G.L.A. c. 123A, § 6A, provides that, subject to exceptions entrusted to an administrative board, "any person committed as a sexually dangerous person ... shall be held in secure custody." Discharge from the Treatment Center does not "terminate ... any ... unexpired sentence." Id. § 9.

demands and interests, to seek to limit the extent to which it worsens Cameron's condition and thereby extends his detention indefinitely. Needless to say, there can be no precision in such a Due Process Clause "standard" nor any way to avoid further dispute about its application, if the parties are bent on dispute.

The district judge, we think, had the right idea in directing the Treatment Center to undertake a good faith reappraisal of its policies as applied to Cameron. The more swiftly the matter is returned to that forum, with that perspective, the better off Cameron will be. As for the state, it may regard the district judge's strictures on its attitude as unfair and heedless of its past efforts for Cameron. But the injunction, at least as we have adjusted it and delimited its future effect, is not unduly burdensome. Like Cameron, the state has an evident interest in a resolution that avoids further litigation.

The district court's injunction is *modified* as set forth above and is otherwise *affirmed*, with the clarifications and upon the grounds stated in this opinion. No costs or attorneys' fees shall be awarded in connection with this appeal.

*It is so ordered.*