Mitchell G. KING, et al.,
Plaintiffs, Appellees,

v.

Milton GREENBLATT, M.D., Commission of the Department of Mental Health for the Commonwealth of Massachusetts, et al., Defendants, Appellees.

Class of 48 + 1 and Donald Pearson, et al., Plaintiffs, Appellants.

Harold G. WILLIAMS, M.D., Commission of the Department of Mental Health for the Commonwealth of Massachusetts, et al. Plaintiffs, Appellees,

v.

Michael LESIAK, et al., Defendants, Appellees.

Norman Knight, Plaintiff, Appellant.

Harold G. WILLIAMS, et al.,
Plaintiffs, Appellees,

v.

Michael LESIAK, et al., Defendants, Appellees.

Sherman Miller, Patton Flannery, David M. Martel, Edward Nadeau, Michael Woodward, Edward Gallagher, James Leblanc and Philip Pizzo, Appellants.

Mitchell G. KING, et al.,
Plaintiffs, Appellees,

v.

Milton GREENBLATT, M.D., Commission of the Department of Mental Health for the Commonwealth of Massachusetts, et al., Defendants, Appellees.

Class of 48 + 1 and Donald Pearson, et al. and Sherman Miller, et al., Plaintiffs, Appellants.

Harold G. WILLIAMS, et al.,
Plaintiffs, Appellees,

v.

Michael LESIAK, et al., Defendants,
Appellees.

Sherman Miller, David M. Martel, Edward Nadeau, Michael Woodward, Edward Gallagher and James Leblanc, Appellants.

Nos. 95–1812, 97–1278, 95–1813, 96–1649, 97–1021 and 97–1057.

United States Court of Appeals,
First Circuit.

Heard Sept. 8, 1997.

Decided July 7, 1998.

Jeffrey S. Follett with whom David R. Geiger was on brief for appellants Pearson, et al.

Charles Donelan for appellants Sherman Miller, et al.

William L. Pardee, Assistant Attorney General, with whom Scott Harshbarger, Attorney General of Massachusetts, and Leo Sorokin, Assistant Attorney General, were on brief for appellees.

James R. Pingeon and Beth Eisenberg on brief for the Center for Public Representation, amicus curiae.

Before SELYA, Circuit Judge, COFFIN and CAMPBELL, Senior Circuit Judges.

COFFIN, Senior Circuit Judge.

This opinion is a continuation of *King v. Greenblatt* ("*King II*"), 127 F.3d 190 (1st Cir.1997), which is the latest judicial discussion in a group of cases dating back to 1972, concerning a resident population of civilly committed sexually dangerous persons in the Treatment Center at the Massachusetts Correctional Institute in Bridgewater, Massachusetts (Center). A reference to prior cases is contained in the opinion just cited. Our present review concerns the proposed modifications, granted by the district court, of two longstanding consent decrees, the Original Decree and the Supplemental Decree.

The Original Decree had provided that the Center would be treated as a facility of the Department of Mental Health (DMH), with primary authority to be exercised by DMH and custodial personnel to be controlled by the Department of Correction (DOC). Patients were to have "the least restrictive conditions necessary to achieve the purpose of commitment." Both DMH and DOC were to "take steps jointly" to improve physical conditions, carry out a meaningful work program, and have "a system of differing security for different categories of patients" to permit less restrictive conditions for those patients not requiring maximum security.

In an earlier opinion we considered challenges to proposed modifications of that decree. *See King v. Greenblatt* ("*King I*"), 52 F.3d 1 (1st Cir.1995). We addressed the

Anthony A. Scibelli with whom Robert D. Keefe, David R. Geiger, Jeffrey S. Follett, Charles Donelan, and Jonathan I. Handler were on brief for appellants Class of 48 + 1 and Donald Pearson and Sherman Miller, et al.

significance of the recently enacted 1993 Mass Acts. ch. 489, which gave DOC exclusive jurisdiction of the care, treatment, rehabilitation and—an added statutory goal—custody of civilly committed sexually dangerous persons in the Center. We held that this statute met the first prong of *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 384, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) (i.e., it was a significant change of law impacting an existing consent decree, warranting modification of such decree), but remanded the case to the district court to consider whether the proposed modifications met the second *Rufo* prong, *id.* (i.e., whether the modifications were "suitably tailored" to the new law). *See King I*, 52 F.3d at 7.

Upon remand, the district court found that the proposed modifications to the Original Degree were "suitably tailored" to the new law; the court also determined that the proposed modifications to the Supplemental Decree met both prongs of *Rufo* as they were "sufficiently related" to the change in state law and "suitably tailored." The case was then appealed to us. We remanded it to the district court to address only issues relevant to the Supplemental Decree, and reserved our "suitable tailoring" review and all other issues relating to the Original Decree.

We recognized that the proposed modifications in the Supplemental Decree went beyond a transfer of exclusive authority to DOC and would effect substantive changes in disciplinary policies, allowing the imposition of sequestration for punishment purposes (except for acts underlying commitment) and deleting a ban on all discipline and punitive procedures in the treatment of inmates civilly committed. *See King II*, 127 F.3d at 195. We opined that the link between a change in administration and sequestration policy was too tenuous, at least without further development. *Id.* We also held that neither Chapter 489, "at least without further explanation," nor our speculation, standing alone, that the Massachusetts legislature had apparently accepted a preference for behavior modification over mental health treatment would constitute a "significant change in law" affecting sequestration policy. *Id.*

We therefore sent back the proposed modifications of the Supplemental Decree to the district court for further consideration, leaving it to the court to decide whether additional factual or opinion evidence was needed. The court has since complied with our directive and, after hearing and submissions, has determined both that the change in control managed by Chapter 489 is a significant change in the law affecting the Supplemental Decree and that the modifications were suitably tailored. We now address this determination and all outstanding issues relating to both decrees.

This litigation, now in its twenty-seventh year, involving half a dozen district judges, magistrate judges, and many conferences, hearings briefings, and appeals, has accomplished much in a troubled and complex field of custody and treatment of institutionalized sexually dangerous persons. During this period, changes have occurred in conditions of confinement and treatment, in the problems confronted, and in the institutional setting. After exhaustive briefings and argument from capable counsel, we conclude that the district court acted sensitively and appropriately in conducting the proceedings below, upholding the proposed modifications of both the Original Decree and the Supplemental Decree, and signaling its readiness to exercise its oversight when occasion warrants. While we cannot expect "closure" of tensions and problems, we may hope for problems of smaller dimension capable of systematic resolution without the necessity of heroic effort.

We first address several issues relating to the Original Decree.

### I. *The Original Decree.*

### A. *Denial of Discovery and Evidentiary Hearing.*

Plaintiffs repeatedly requested the opportunity to engage in discovery and an evidentiary hearing. They sought to discern whether DOC intended to provide "meaningful treatment under the Plan" and whether its treatment plan was consistent with the "least restrictive conditions" requirement of the Original Decree. Plaintiffs proposed accomplishing this by exploring DOC's past

behavior, present behavior, and expressions of future intent. Plaintiffs' proposal contemplates interviews with all residents, examination of new procedures, expert testimony interpreting the Plan, investigation of current practices, inquiry into internal memos relating to the Plan and the persons instrumental in formulating it, and depositions of DOC officials and Joint Resource Institute (JRI) personnel responsible for treatment. As much as six months of time would be needed.

The basic response of the court in denying discovery requests was:

> It may be that the plan won't work, but the Court of Appeals ... [told me not to] prejudge the plan, but they told me ... I should have a hearing, inquire into the DOC plan, giving significant weight to the local government.

> \*   \*   \*   \*   \*   \*

> ... [W]hat would DOC do under this plan? And then I should use my judicial oversight, primarily rely on my judicial oversight, to insure that the DOC is complying with the decrees. So it seems to me that that's a very clear blueprint.

■ This was an accurate precis of our directives "to give significant weight to the views of local government officials" and to "rely primarily on its jurisdictional oversight to ensure DOC's compliance with the decrees." *King I*, 52 F.3d at 7. Moreover, even absent these directives, a trial court is vested with broad discretion in granting or denying discovery. 8 Charles A. Wright et al., *Federal Practice and Procedure* § 2006, at 91 (1994).

■ The task of the district court, following our directives, was to determine whether DOC, which had been given authority under state law, was likely to manage the Center without doing violence to the substantive portions of the Original Decree. In the words of the Special Master appointed by the court, the inquiry being undertaken was "whether DOC is approaching the control of the institution with a treatment modality."

■ In support of its proposal for extensive discovery and hearing, plaintiffs relied principally on the extensive procedure which the trial judge adopted on remand in *Inmates of the Suffolk County Jail v. Rufo*, 844 F.Supp. 31 (D.Mass.1994). But it does not follow from the fact that a judge allowed discovery and evidentiary hearing in one case that a denial of discovery in a different case is an abuse of discretion.

Appellants' basic interest in discovery was to elicit views and evidence of DOC's sincerity. To test the viability of this goal in the particular posture in which the district court found itself, we venture the following scenario. Assume that a number of witnesses testified in deposition or at a hearing that DOC officials were insincere and had no intention of carrying out the Plan as written. If the court found the witnesses credible, would it then deny DOC's request to modify? The consequence would be that the Center would then revert to the earlier dual management, despite the passage of Chapter 489. Or, would the court craft, as amicus argued, its own solution, substituting the Clinical Director for DOC, creating the bizarre situation of an employee of an entity under contract with DOC holding powers denied to DOC? In either case DOC would have no future opportunity to demonstrate its fitness to manage.

It seems clear to us that had the court pursued either course, it would not have accorded "significant weight to the views of local government officials." Indeed, it would have rejected them in their entirety on the ground of insincerity. This would violate not only our guidance but that of the Supreme Court in *Rufo*, 502 U.S. at 392 n. 14, 112 S.Ct. 748. It would also violate our directive to rely primarily on continuing oversight.

We think it therefore reasonable, at the proposed modifications stage, that the district court declined to allow an extensive investigation as to whether DOC was acting in good faith. We are not saying that the court would have abused its discretion had it chosen to allow some kind of discovery and evidentiary hearing, but certainly it did not abuse its broad discretion in denying such.

*B. Delayed Appointment of Counsel.*

Among the interests represented in the cluster of lawsuits now collected under the *King v. Greenblatt* tent are those raised in

*Williams v. Lesiak,* 822 F.2d 1223 (1st Cir. 1987). In that case, the plaintiffs had focused on treatment issues at the Center, particularly the absence or inferior quality of work, job training, and educational programs. On May 27, 1994, the district court reopened *Williams* and consolidated it with *King.* Although the remaining *Williams* plaintiffs requested counsel on a number of occasions, counsel was not appointed for them until August 17, 1995. This delay, they contend, constituted an abuse of discretion and is reason for reversal.

Here again the review threshold is high. This being a civil case, there is no constitutional right to counsel and the statutory authority, 28 U.S.C. § 1915, is discretionary. *See Cookish v. Cunningham,* 787 F.2d 1, 2 (1st Cir.1986). Moreover, we may find reversible error only if "exceptional circumstances were present such that a denial of counsel was likely to result in fundamental unfairness impinging on [plaintiffs'] due process rights." *DesRosiers v. Moran,* 949 F.2d 15, 23 (1st Cir.1991).

Our review of the evaluation of this complex and multi-faceted litigation during the fifteen months of delay reveals court actions which manifested a sensitivity to the interests of *Williams* plaintiffs and a total absence of recognizable unfairness. The first stage during this period began on May 27, 1994, with the reopening of *Williams* and the court's denial of the Commonwealth's motion to modify the Original Decree. At this time the court, having recently appointed counsel for a different group of patients intervening in *King,* the "Class of 48 + 1," expressed the hope that such counsel would "look at the global picture." The court also indicated that it might look for another person who would represent only the *Williams* plaintiffs. In December 1994, appointed counsel for the "Class of 48 + 1" plaintiffs informed a *Williams* party that he was not representing his interests. From this time, therefore, until August 17, 1995, the *Williams* plaintiffs knew they were unrepresented.

Any lack of representation during this period, however, was without any practical effect. As the district court denied the Commonwealth's motion to modify at the hearing on May 27, 1994, the *Williams* plaintiffs suffered no disadvantage at that time. We did not issue an opinion on the Commonwealth's appeal of that denial until April 6, 1995. The appeal concentrated on the significance of the enactment of Chapter 489, and did not raise any *Williams* issue. Our opinion, after holding that the statute had indeed constituted a significant change of law, meeting *Rufo*'s first prong, simply remanded the case to the district court to consider whether the second *Rufo* prong had been met. Again, there was no opportunity for harm to the *Williams* plaintiffs' interests in the appeal. In the interim period between the denial of the motion to modify and our decision on the appeal, DOC submitted its Management Plan for the Administration of the Treatment Center (Plan), views were exchanged between a Special Master and DOC, and settlement discussions took place. These discussions generally resulted in an impasse. Moreover, during much of this time, the interests of all residents were identical, since the original motion to modify sought only a change in administrative control.

In May 1995, the court denied discovery, *see supra,* resolving to confine its efforts to a close scrutiny of the Plan itself. Thus, neither side was allowed to investigate or receive additional documentation on or deposition of the other. And although on November 11, 1994, the Commonwealth filed a renewed motion to modify, seeking a change in the Supplemental Decree, no action was taken by the district court until June 29, 1995. At that time, the district court granted the renewed motion, but it also stayed four important parts of the Plan, including the Community Access Plan (CAP), involving issues prominent in *Williams.* Six weeks later, on August 17, 1995—before any action was taken on the stayed provisions of the Plan, or on any other area concerning which the *Williams* plaintiffs had expressed concern—counsel was appointed.

On this record, not only have counsel been unable to point to any prejudice stemming from the delay in appointing counsel for the *Williams* plaintiffs, but we see no possibility, as the case progressed through its various

stages, of any prejudice or "fundamental un-fairness." We are satisfied that their inter-ests were adequately protected by the ap-pointment of counsel in August 1995.

#### C. "Suitable Tailoring" of Modifications.

■ The second prong of *Rufo* requires that a consent decree be changed no more than necessary to resolve the problems creat-ed by the change of circumstances. The proposed modifications must not defeat the core purpose of the consent decree nor, of course, create a constitutional violation. *See Rufo*, 502 U.S. at 391–92.

■ Superficially, one might say that the changed circumstance is simply the vesting of all authority over the Center in DOC and that the proposed modifications for the Origi-nal Decree merely parrot Chapter 489 by substituting DOC for joint mention of DOC and DMH. Such a literal approach, however, obscures the reality that the Massachusetts legislature, in vesting unitary control in DOC, was also recognizing that DOC's views of the policies best suited to balance the two objectives of the Center—effective treatment of the sexually dangerous persons and the security and safety of the patient/inmate and the population as a whole—differed from those which had guided DMH during much of the previous quarter of a century. Legis-lative emphasis on the goal of security and safety is evidenced by the addition of "custo-dy" in the Chapter 489 amendment to the previous formulation of goals in Mass. Gen. Laws. ch. 123A § 2 of "care, treatment and rehabilitation." Accordingly, the change in control contemplated change in operations and embraced the grant of some degree of flexibility and initiative to DOC.

Similarly, the proposed modifications can-not be limited to the simple change in au-thority, since, as we have just noted, that change is inevitably overlaid with some ex-pectation of change in some policies and practices. This does not mean that DOC has carte blanche to do anything it wishes, for the Original Decree remains unmodified in its requirement that "patients at the Treat-ment Center should have the least restrictive conditions necessary to achieve the purposes of commitment."

This provision is the substantive essence of the Original Decree. The decree does not embrace all the policies and practices that have been relied on in the past by DMH to achieve effective treatment under the least restrictive conditions. By the same token, as the district court realized, the "proposed modifications" are not the host of provisions in the 138–page Plan, which simply sets forth ways in which DOC aspires to fulfill the requirements of the Original Decree.

The task of conducting a "suitable tailor-ing" analysis therefore requires trying to determine if the basic thrust of the new authority is likely to violate "least restrictive conditions" or constitutional requirements. While the Commonwealth has the burden to demonstrate "suitable tailoring," we have also instructed the district court, as we have noted, to give significant weight to the views of local officials and to rely "primarily" on continuing judicial oversight to rectify viola-tions. *King I*, 52 F.3d at 7. Accordingly, unless a demonstrably inadequate or errone-ous policy undercutting the Original Decree appears from an anticipatory scrutiny of the Plan, DOC should be allowed to proceed.

The district court had before it not only the Plan but two volumes of appendices, ex-hibits, and affidavits, comments from the plaintiffs and the Special Master, and re-sponses by DOC. The Plan has seven sec-tions: (1) management and staffing; (2) clini-cal treatment program; (3) educational and vocational treatment; (4) behavior manage-ment; (5) resident management and opera-tions; (6) CAP; and (7) integration of the Center with the prison program for sex of-fenders. The district court reviewed in some detail behavior management provisions (spe-cifically, the Behavior Review Committee, the Minimum Privilege Unit, and Transfer Board policies), CAP, and resident manage-ment and operations (specifically, the restric-tion of privileges).

The court found that the Plan was "a permissible and detailed proposal" address-ing both the increased emphasis on security and treatment concerns. With respect to security, the court stated, "security concerns in the Treatment Center have always been

viewed as legitimate." As to treatment, the court took note of the fact that treatment was to be provided by JRI, which had been under contract with DMH since 1992, and that its employee, Dr. Barbara Schwartz, the Center's Treatment Director, affirmed that DOC would retain the clinical, educational, vocational and rehabilitation programs initiated by JRI. It therefore approved the proposed modifications, concluding that the Plan "appears to properly balance the competing goals of treatment and security and adequately protects the rights of the residents."

The court refused, however, to vacate the Decrees, as the Commonwealth requested, stating:

> While the Plan details the provision of treatment and the ability of DOC to address security concerns, at bottom, the potential for conflict between these interests continues to exist. The confusing and conflicting roles of DMH and DOC have been resolved. It is DOC's sole responsibility to provide treatment in a secure setting. The Plan provides them with the rules to accomplish this. The Plan does not, and no plan can, provide the willingness and commitment in doing so.

Thus recognizing that only future performance would administer the Plan in harmony with the essence of the Decrees, the court denied the motion to vacate without prejudice to review it for one year; following that period, during which the court would monitor Plan implementation, it would reconsider the motion.

On appeal, appellants first level the general charge that DOC "has essentially turned the Treatment Center into a prison and fundamentally altered the therapeutic community." It is, of course, true that the added emphasis on security and safety, together with a new approach to behavior management, featuring definite sanctions for defined unacceptable behavior, will inevitably effect some retreat from a more permissive atmosphere. But appellants' sweeping condemnation cannot stand without more precise identification of serious defects in the many provisions regarding varieties of treatment, the extent of clinical supervision, and the safeguards of individual rights.

Appellants turn specifically to four areas. The first is CAP, where the participants have shrunk from fifty-six in 1988 to two in 1997. They also criticize the application process that must be completed by an patient/inmate before being accepted for release into the community. Under the Plan, the patient/inmate must initiate his own program proposal, then must face review with the prospect that, if once denied acceptance, he must begin again after a six month delay. Appellants also say that the Community Access Board should, under *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), be entirely composed of clinicians.

The Plan devotes some forty-four pages to CAP. This has obviously been a subject of intense rethinking. Under a change in the statute, a resident is no longer eligible for participation if he is still serving a sentence; he must now have completed serving any criminal sentence. The introductory section observes that the prior policies did not adequately emphasize public safety and states, "Recent events and improvements in the understanding of both the dynamics of sexual offenses and the realistic objectives for treatment, as well as legislative change to Chapter 123A, have lead [sic] to the development of a revised program." The Plan adopts a cautious approach which recognizes that "sexually dangerous persons" will "never cease to be 'at risk.'"

Accordingly, whereas access to the community had earlier been approved prior to the designing of a program, careful, even meticulous, planning must now precede approval of access. The process of plan review and approval is indeed a daunting, attenuated one. But we cannot at this juncture rule the new program out of bounds. In this most sensitive area of tension between safety and treatment, and between the individual and the community, we cannot say that CAP is not the least restrictive feasible response.

The shrinkage in numbers of participants must be viewed against the background that a substantial number of residents, many of whom are serving very lengthy sentences, simply refuse to participate in or apply to treatment programs. Moreover, a JRI anal-

ysis reveals that in 1996, three of the ninety-one eligible residents of a total population of 202 submitted applications and proposed plans. As of January 1997, two remained in the program while twelve resided in the less restrictive Community Transition House in a "pre-transition" program. This does not, in our opinion, point to any obvious constitutional failure. Further adjudication will have to await events.

As for the *Youngberg* argument that the entire Community Access Board should consist of clinicians, we refer to our discussion, *infra*, in relation to a similar criticism of decision making in the behavior management area.

Another area of specific criticism is the Transfer Board and its policies. The Transfer Board is a creation of Chapter 489, enacting a new section 2A of Chapter 123, which provides that a resident who is serving under an unexpired criminal sentence may be transferred from the Center to a correctional institution. The factors that may be considered are "unamenability to treatment," "unwillingness to follow treatment recommendations, lack of progress in treatment, danger to other residents or staff, [and] security." Appellants say the policies fail to identify treatment and the criteria for "unamenability of treatment." They also contend that the Board is insufficiently clinical in composition, and that there are no criteria defining when a patient may be eligible for return to the Center.

We preface our consideration of appellants' contentions by recalling the basic rationale that prompted the new statutory provisions. As Dr. Schwartz explained in her affidavit, the earlier transfer provisions allowed transfer only for threat of harm or escape. She observed that some residents refuse treatment; they "cannot profit from treatment simply because of the length of their underlying sentences." Instead of these residents occupying limited places at the Center, it makes "far more sense" to allow "new and motivated admissions."

We find adequate assurances of treatment. In the first place, the Plan indicates that in placing a resident, the classification process will attempt to identify an institution where sex offender treatment is available. Additionally, the statute itself states that DOC "shall make available a program of voluntary treatment services." Finally, a member of the Center's treatment team will be liaison to prison staff. As for vagueness of "amenability" and "security," regulations have fleshed out the terms, the former being defined as failure to participate or make progress in six months and the latter as consisting of danger of physical harm to others manifested through threats or assaults.

With respect to appellants' claim that the criteria for return to the Center are undefined, we think that the Plan properly addresses the need for criteria. It specifically contemplates the establishment of guidelines, stating, "the Transfer Board will suggest minimum criteria for consideration of the resident's future return to the Treatment Center." The provision charges those persons responsible for transferring inmates to the Center—and therefore those persons most knowledgeable about the risks and responsibilities accompanying the return of inmates—with determining how best to accommodate the needs of the inmates, the Center and DOC.

We have also reviewed appellants' arguments that the transfer policies violated due process, double jeopardy and the ex post facto clause. The first claim is based on the assumption, which we have stated is unfounded, that suitable treatment will not be available to any transferred resident. The last claims rest on the assumption that a transferred resident will suffer a belated increase in his sentence. We find it unnecessary to elaborate on the district court's opinion resolving these issues as we are satisfied with the judge's analysis and conclusion that, on the record before him, there was no evidence of such increase.

With respect to clinical participation, the district court noted in its opinion that

The Commonwealth has agreed to modify the composition of the Board so that the Clinical Director of Treatment, the Deputy Superintendent of Programs and the Director of Security will be equally represented.... In other words, the decision

will be made by a vote of the professionals charged with the operation of the Treatment Center.

Appellants continue to assert that the only "professionals" who could fulfill the requirement of *Youngberg* are mental health professionals. We discuss this issue in the following paragraphs involving behavior management. Our conclusion is equally applicable to the Community Access Board and the Transfer Board.

An appropriate place to start our analysis of the behavior management component of the Plan is to examine appellants' criticism of the manner of imposing sanctions. We note that this criticism is levied at the Original Decree and is to be distinguished from the substance, punishment and sequestration, which are proscribed by the Supplemental Decree.

The controlling document, 103 MTC 430A, "Observation of Behavior Reports," sets forth the Center's disciplinary system, including a "clear set of rules" and a "clear set of sanctions." The monitoring and enforcing body is the Behavior Review Committee. Appointed by the Superintendent, it consists of one security staff member, one clinician and one JRI staff member. This committee deals with violations meriting such sanctions as warnings, and room, unit, work, and visitation restrictions. In addition, the Superintendent has the authority to impose sequestration awaiting hearing, investigation, prosecution or a transfer hearing in instances where the resident has threatened, attempted, or inflicted serious harm on others.

Appellants contend that such decisions violate the teaching of *Youngberg* that only qualified professionals should make treatment decisions regarding involuntarily committed individuals. We begin by noting, as we did in *Cameron v. Tomes*, 990 F.2d 14 (1993), that *Youngberg* was a "cautiously phrased decision," directed to the right of a mentally retarded inmate to "minimally adequate ... training to ensure safety and freedom from undue restraint." *Id.* at 18 (citing *Youngberg*, 457 U.S. at 319, 102 S.Ct. 2452). Moreover, the Court in *Youngberg* gave a rather flexible, context-related definition of

what it meant by "professional": "a person competent, whether by education, training or experience, to make the particular decision at issue." 457 U.S. at 323 n. 30, 102 S.Ct. 2452. It added the circumscribed caveat that "[l]ong-term treatment decisions normally should be made by persons with degrees in medicine or nursing, or with appropriate training in such areas as psychology...." *Id.* Unlike in *Youngberg*, what is at issue here is not long term treatment decisions but short term disciplinary decisions. We look in our analysis to the guidance we deliberately gave, in *Cameron*, for the future application of the concept of professionals and to the role of administrators:

> Any professional judgment that *decides* an issue involving conditions of confinement must embrace security and administration, and not merely medical judgments.... The administrators are responsible to the state and to the public for making professional judgments of their own, encompassing institutional concerns as well as individual welfare.

990 F.2d at 20.

In this case, the disciplinary system is responsive to both the "treatment" need of residents to learn accountability for their actions and the administrative and security concerns of the institution. The composition of the Behavior Review Committee, with one DMH professional, and one security-minded member from DOC, and one JRI person with overall treatment program responsibility seems well suited to the mix of concerns involved in sequestration decisions. Indeed, if mental health professionals were to control all decisions, certainty and regularity of sanction imposition would necessarily be swallowed up by ad hoc individualized decision making. We know of no case authority that would declare the decision process in applying sanctions described in the Plan facially constitutionally defective. We decline the invitation to extend *Youngberg* anticipatorily to this case.

The authority to sequester "awaiting action" wielded by the Superintendent implicates procedural concerns. The district court was sensitive to these concerns and required DOC to give the due process pro-

tections of written notice of reasons for placement and opportunity to respond required by *Hewitt v. Helms,* 459 U.S. 460, 471, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), in cases of administrative segregation. The court, in so doing, acknowledged that its action stemmed from its recognition that residents, unlike the prison inmate in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), were entitled to due process protections. Again, on this record we are not prepared to declare any breach of procedural due process.

A final target of the criticism is in the area of resident management and operations. Appellants protest a number of privileges which have been truncated. These involve the amount of clothing allowed to be kept by a patient, the amount of funds, and the number of room visits, telephone calls, stamps, credit cards, etc. The Plan justifies some reduction in these privileges because of past experiences with security, assault, gambling, coercion, and interruptions in treatment. No reduction rises to the level of a constitutional infraction.

When all the smoke has cleared, the legislatively ordered change in command and the directions which it proposes to take do not exceed the reasonable latitude implicit in the legislative change of command. Nor does either appear likely to undermine the Original Decree or to violate the Constitution.

## II. *The Supplemental Decree.*

### A. *Modification.*

■ While modification of the Original Decree involved mainly a change from dual control to exclusive DOC management of the Center, the Supplemental Decree and any modifications proposed were substantive. The Supplemental Decree barred solitary confinement for punishment, "disciplinary and punitive procedures having no place in the care and treatment of civilly committed patients." The requested modifications would strike the general proscription of disciplinary and punishment procedures and link solitary confinement to the offense underlying the original commitment of the individual.

In *King II,* we were not persuaded that the mere change in control implicated this substantive change. We therefore remanded the question of justification for modification and left it to the district court to decide whether further factual development or opinion evidence was needed. The court decided that it did not require an evidentiary hearing and scheduled a prompt submission of briefs and a hearing for presentation of views. Appellants submitted several affidavits, and appellees rested on the record. The court ruled that a significant change in fact had occurred, based on examination of the Plan and monthly DOC reports which verified DOC's adherence to the Plan, a visit to the Center with counsel, discussion with the residents at the Center, and review of opinions of the qualified professional in charge of the administration of the Plan, Dr. Schwartz. The court also stated that the dramatically changed conditions of segregation that had taken place since 1972 constituted a relevant added factual development.

We agree with the district court but would add another factual development called for by our scrutiny of the record, namely, a significant change in the philosophical approach to treatment of civilly committed sex offenders in programs operated by correctional departments. We do not mean that there has been a complete reversal of position under all circumstances from the earlier, more permissive mental health approach to the more restrictive behavior control approach. But the monolithic acceptance of the mental health approach that existed a quarter of a century ago has yielded to the acknowledgment that there is no royal road to treatment and cure. Behavioral control programs including defined offenses and sanctions are now featured in institutions operated by corrections personnel.

We begin with the 1989 report of the Governor's Special Advisory Panel on Forensic Mental Health, which preceded the passage in 1994 of Chapter 489. We do not rely on opinions expressed by that Panel, but on some factual statements which have never been impugned. Indicative of some kind of sea change is that most of the thirty-one states that had "special dispositional provi-

sions" for sex offenders, i.e., indefinite commitments as in Massachusetts, repealed or significantly reformed the statutes. Repeal was recommended by the American Bar Association in its 1984 proposed Criminal Justice Mental Health Standards on the ground that, *inter alia,* the assumption that mental disability underlay sexual offenses in general was no longer viewed as clinically valid. A 1977 report of the American Psychiatry Association to the same effect was cited.

Dr. Roger Smith, the impressively credentialed Director of Michigan's Bureau of Forensic Mental Health, narrowed the focus to programs run by correctional personnel. In 1994, he evaluated the Massachusetts DOC Plan. In an affidavit, he made the point that in institutions where civilly committed residents and corrections inmates are lodged and treated, "[E]very attempt must be made to apply program rules, and sanctions for violation of such rules, in a uniform and fair manner, and to avoid the perception (or reality) that civilly committed residents have privileges and rights which exceed those of their DOC peers." In states that have opted to treat sex offenders only in the months prior to parole release, he added, programs generally are provided in minimum security settings. As for DOC's Plan, "[t]he establishment of clear rules and sanctions for rule violations by residents is clearly long overdue, and essential to effective management of the therapeutic program." He also found the restrictions on residents' privileges, such as visits and mail, to be "consistent with standards found in correctional treatment programs nationwide."

To this we add the unrebutted factual assertions of Dr. Schwartz, who is a JRI employee and the Clinical Director of the Center. Having trained staff from most of the prison-based sex offender treatment programs, she made the unqualified statement: "Every sex offender program in the country which is operated by a corrections department adheres to the disciplinary policy of the institution."

These affidavits were filed with the court in November 1994. Only after remand did appellants seek to counter such statements in any way. In 1997, appellants filed affidavits of clinical directors of treatment programs in Kansas and Washington. These programs were run by a department of Social and Rehabilitation Services or of Social and Health Services and were available only to persons soon to finish serving their sentences or without criminal sentences, whose release depended solely on their ability to control their conduct. It is understandable that in Kansas sequestration for a period in excess of fifty-nine minutes was rare, and that in Washington there had been only one occasion in thirteen months to keep an inmate in a "quiet room" for up to four hours. Clearly, the populations and the problems were quite different from those in the Center. Appellants also submitted a draft of a proposed patients' handbook from Wisconsin, but although some twenty-two definitions of "major misconduct" were set forth, the Appendix we were furnished did not contain standards for either incapacitation measures or deterrent sanctions. The program, unlike that we consider here, was confined to those who were only civilly committed. We view appellants' submissions concerning other states' civil-commitments-only programs as essentially comparing oranges to appellees' apples.

Finally, appellants attempt to demonstrate that there has been no change in basic treatment philosophy by submitting a 1972 policy statement by Dr. Harry Kozol, then Director of the Center, who did not attribute his policy eschewing punishment to a mental illness theory but rather to a view of self-discipline and personal accountability as focal patient goals. Any similarity with the present treatment philosophy stops at this point. For Dr. Kozol went on to describe the process of enforcing accountability: when a patient was found to have engaged in "antisocial and inappropriate behavior," a clinical study would be made of steps needed to be taken, which could include, not segregation, but "exclusion from the population and placement in the Special Intensive Treatment Unit." This was, he stated, not looked upon as "lock-up" but, "[i]n operation, this program has excluded patients from the general population for considerably longer periods than patients ... were excluded in lock-up by the correctional authority here."

We think it clear that this system—lacking definitions of "antisocial and inappropriate behavior," and with sanctions that vary according to the clinical analysis, indeterminate sequestration, and release that depends on "our clinical judgment that the risk of his acting offensively and inappropriately is reduced to a reasonable or substantial [sic] level"—differs significantly from the Plan's approach.

The factual assertions of the Special Advisory Panel and Dr. Schwartz, together with the observations of Michigan's Dr. Smith, lead us to accept as a significant change of fact the adoption of a new treatment approach to sex offender treatment programs conducted by corrections departments. Our survey of this record also convinces us that the court did not err in not delaying its consideration pending further discovery. Appellants' request in their Joint Submission Concerning Supplemental Decree was couched in the alternative. In the event that the court did not deny the motion to modify the Supplemental Decree, they wished discovery, citing as their only objective, "the deposition of defendants' witnesses." What we said in connection with the refusal to extend discovery relating to the Original Decree applies here. We see little fruitful prospect in such proceedings; the court did not abuse its discretion in refusing such a request.

The district court suitably relied on the Plan, its visit to the Center, its talks with residents who did not complain about discipline, punishment, or conditions in the Minimum Privilege Unit, and on the opinion of Dr. Schwartz who averred, "I consider the institution of a disciplinary policy containing clearly defined offenses carrying definitive sanctions as an essential part of a state-of-the-art treatment program." The court added that since punishment was clearly contemplated, "it follows that appropriate punishment may include sequestration of some kind." This last proposition may not be self evident. We therefore elaborate.

A reading of the Code of Offenses and list of sanctions suggests to us the essentiality of sequestration to this Plan. There are fifty-nine offenses divided among four categories.

There are eleven offenses described in the category of the greatest severity, such as killing, rape, arson, and taking hostages. In the high category are seventeen offenses, including assault, bringing in illegal drugs, demanding protection money, and counterfeiting. The nineteen offenses in the moderate category include refusing a direct order, lying to a staff member, and threatening another person. The low category consists of twelve offenses, ranging from use of obscene language and unexcused absences, to failure to follow safety regulations.

In like manner, the sanctions vary both according to category and to whether the offense is accompanied by mitigating or aggravating circumstances—or neither. The most severe sanction is placement in the Minimum Privilege Unit for thirty days for a severe offense accompanied by aggravating circumstances. Other sanctions available for severe offenses include loss of privileges from sixty to eighty days, restitution, forfeiture of good time, restitution, and loss of job. The maximum sanction for a high offense, with aggravating circumstances, is placement in the Minimum Privilege Unit for five days with a lesser alternative being room restriction for ten days, and, like a severe offense, restitution, loss of privileges, good time, and job.

It is obvious that, if placement in the Minimum Privilege Unit were not available as a sanction, the range of sanctions would be so telescoped and compressed that a resident could not expect much more severe treatment for a high or severe offense than for a moderate offense. For example, a resident who had taken hostages might lose some privileges for eighty days while a resident who refused an order might lose some privileges for five days. The disparity between offenses far exceeds the disparity in sanctions that could be imposed. We therefore also conclude that sequestration is an integral part of the Plan's system of graduated and defined offenses and sanctions.

Finally, we cannot fault the court for relying on the "vastly different" conditions of confinement in the Minimum Privilege Unit today compared to those described in the *King* complaint. King, placed in solitary

confinement without procedural safeguards for calling a guard a "dingbat," was placed in a six by nine foot cell, without a sink, only a portable chamber pot, no facilities for drinking water, no reading or writing materials, no visits—not even from his parents—no radio or exercise ... and filthy walls and floor.

The Minimum Privilege Unit, on the other hand, is a new building constructed in 1986, with rooms eight by sixteen feet, with toilet and sink. Residents are allowed access to telephone, visitors, exercise periods, daily showers, canteen, and library. The regulations, 103 MTC 423.07, provide that residents in the Minimum Privilege Unit will be accorded treatment by their regular treatment team, unless some modification is dictated by safety and security. Additional or supplemental treatment "will be provided as necessary."

We are fully satisfied that this combination of a difference in basic approaches, a detailed Plan maintaining treatment standards accompanied by a detailed disciplinary system, and dramatic changes in conditions of confinement amounts to the significant change in facts required by *Rufo.*

As for the second prong, "suitable tailoring," there is little need for lengthy discussion. The Plan preserves clinical treatment programs and procedural safeguards. Its departures from the Supplemental Decree, inaugurating a disciplinary system and outlining procedures for charging, deciding, and reviewing infractions seem well within reasonable requirements. The major area of difference, the Plan's provision for sequestration, reveals a restrained resort to this sanction. Placement in the Minimum Privilege Unit is allowed under only four circumstances: commission of a severe offense with aggravating circumstances (up to thirty days); a severe offense without either aggravating or mitigating circumstances (up to twenty days); a severe offense under mitigating circumstances (up to ten days); and a high offense under aggravating circumstances (up to five days). The only other kind of confinement is restriction to one's room, which can be imposed for ordinary and aggravated high offenses for seven and ten days, and for an aggravated moderate offense for five days.

Given the legitimacy of a disciplinary system in a treatment program under the auspices of a department of correction, such utilization of sequestration fulfills the requirement of being suitably tailored to the change of circumstances. We find that modification of the Supplemental Decree is therefore justified.

\* \* \*

We note only briefly an issue that our decision has mooted—whether or not the district court erred in vacating several orders of Judge Young. These orders all dealt with participation of psychologists or psychiatrists in various kinds of decision and policy making in the use of sequestration. Our holding that the proposed modifications in the Supplemental Decree as illustrated by the Plan are both based on significant changes in fact and are tailored to those changes leaves no room for the continued survival of Judge Young's orders, which served as interim measures pending a long-term resolution.

We have considered the other arguments advanced by appellants, intervenor plaintiffs, and amicus and deem them either to raise issues not presented to the district court or otherwise without merit.

At this point we can only say that court and counsel have done their jobs well in what must be one of the most complex and vexing areas of law and administration. What we have said in upholding modifications of the Decrees concerning DOC's Plan should not be construed as rulings foreclosing issues arising out of Plan administration in the future. What we have done is to survey the new regime, its general approach, and to give a green light. That does not mean that reckless driving will be immune from review. We rely on the district court, which has commendably shown its readiness to exercise its oversight powers.

*Affirmed.*